```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
                       WESTERN DIVISION
```

| | |
|---|---|
| LAUREN LEE GAUCK,<br><br>    Plaintiff,<br><br>v.<br><br>HOOMAN KARAMIAN a/k/a CORBIN GRIMES a/k/a NIK RICHIE, DIRTY WORLD, LLC d/b/a THEDIRTY.COM and/or THEDIRTYARMY.COM; DIRTY, INC.; THE DIRTY, LLC; DIRTY WORLD ENTERTAINMENT, LLC; and DIRTY SCOTTSDALE, LLC;<br><br>    Defendants. | No. 2:11-cv-02346-JPM-tmp |

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Before the Court is Plaintiff Lauren Lee Gauck's ("Plaintiff" or "Gauck") Application for Temporary Restraining Order and Order to Show Cause (Docket Entry ("D.E.") 4), filed May 4, 2011, which the Court construed as a Motion for a Preliminary Injunction on May 9, 2011 (D.E. 5).  Defendants Hooman Karamian a/k/a Corbin Grimes a/k/a Nik Richie ("Richie"), Dirty World, LLC d/b/a TheDirty.com and/or TheDirtyArmy.com ("Dirty World") (collectively "Defendants") responded in opposition on June 17, 2011.  (D.E. 22.)  Plaintiff filed a reply on June 29, 2011.  (D.E. 31.)  With leave of the Court, Defendants filed a sur-reply on July 6, 2011.  (D.E. 34.)

The Court held a preliminary injunction hearing on July 21, 2011.  Present for Plaintiff were C. Barry Ward, Esq. and

Richard Townley, Esq.  Present for Defendants was Brent Siler, Esq.  Plaintiff Lauren Lee Gauck[1] was also present.

The Court, having carefully reviewed the submissions of the parties, and having heard the arguments of counsel at the hearing, hereby DENIES Plaintiff's motion for a preliminary injunction for the reasons stated below.

**I. BACKGROUND**

The various Defendants named in Plaintiff's complaint own and operate the website TheDirty.com.  Founded in 2007 by current editor-in-chief Richie, the site provides a forum for users to "submit dirt" on themselves and others, which can include news, photos, video or text, and to comment on material submitted by others.  (Aff. of Nik Lamas-Richie ("Richie Aff.") (D.E. 34-1) ¶¶ 2, 7.)  According to Defendants, the site is "devoted to publishing news, gossip, humor, and satirical commentary about a wide variety of topics . . . ."  (Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. ("Defs.' Resp.") (D.E. 22) 2.)

Since its inception, TheDirty.com has grown significantly in its popularity and currently receives an average of 18 million hits per month.  (Richie Aff. ¶ 6.)  In its infancy, the content of the site was largely created by Richie.  (Id. ¶ 7.)

---

[1] Plaintiff was married following the filing of her complaint. Plaintiff's married name is Lauren Lee Gauck Giovanetti.

2

Today, however, the majority of the material appearing on the site is comprised of submissions uploaded directly to the site by third party users. (Id. ¶ 7.) As of July 2011, the site contains more than 75,000 unique posts on a wide variety of topics. (Id. ¶ 8.)

Defendants explain that, although submissions to the site are generally reviewed and moderated by Richie, user-generated posts appearing on TheDirty.com are not fact-checked for accuracy. (Id. at 2.) A disclaimer appearing at the bottom of the site states: "The content that is published contains rumors, speculation, assumptions, opinions, and factual information. Postings may contain erroneous or inaccurate information. . . . The owner of this site does not ensure the accuracy of any content presented on TheDirty.com." See The Dirty, http://thedirty.com/ (last visited July 22, 2011).

Plaintiff is a television news reporter for Fox 13 News in Memphis, Tennessee. (Compl. ¶ 11.) In or around April 2011, Plaintiff learned that she was the putative subject of two posts submitted to TheDirty.com by a third party. (Compl. ¶¶ 14-16.) The authors of the posts claimed that Plaintiff used illicit drugs, was sexually promiscuous, exchanged sexual favors in return for drugs and money, and assaulted an unknown person. (Id. ¶¶ 15-16.) Plaintiff avers that the statements are "patently false and defamatory." (Id. ¶ 17.)

3

The author of the first post, dated April 12, 2011 and entitled "Chi Town Sloots," included a photo of Plaintiff with her friends at the beach wearing bikinis. (Id. ¶ 14.) The author of the second post, dated April 14, 2011 and entitled "Chicago Girls Need to Be Exposed," included a photo of Plaintiff and three friends attending a Chicago Cubs baseball game. (Id. ¶ 14.) In addition, the author of the second post stated "I am attaching a few pictures for your enjoyment . . .," and attached several photos of a woman posing nude, exposing her buttocks, breasts, and genitalia. (Id.) Plaintiff asserts, and it is uncontroverted, that she is not the woman in the pictures and does not know the woman actually pictured therein. (Id.)

As the site's moderator, Richie often posts short editorial comments in response to submissions from users, which Richie characterizes as "humorous and often somewhat negative." (Defs.' Resp. 3.) In response to the first post, Richie commented "No, the anger comes from their failure in life, I think it's time to switch to a 1 piece ladies." (Id. at 3.) In response to the second post, Richie commented "Pictures don't lie ladies . . . these are the same girls who email me crying saying they have only slept with one guy and are innocent good girls. –nik." (Id. at 5.)

In his affidavit, Richie states that he did not create or materially modify any part of either post in question. (Richie

4

Aff. ¶¶ 12, 15.) He avers that both the text in the body of the posts and the title of the posts were created entirely by third parties. (Id.) Further, Richie states that the posts were published exactly as submitted, without any changes other than the following modifications made pursuant to the site's general policies: (1) Defendants usually attempt to redact profanity, and in these instances, letters in several words were redacted and replaced with asterisks; (2) as with all posts submitted by third parties, Defendants added an introductory statement that read "THE DIRTY ARMY:" to reflect that the post was submitted to the site by a third-party user; (3) pursuant to a general policy not to publish photos containing nudity, all of the nude images submitted were redacted to cover the bathing suit areas of the women shown in the photos; and (4) the photos were automatically watermarked by Defendants' system with a logo from the site pursuant to the user's electronic acceptance of a standard licensing agreement. (Id.)

Shortly after learning about the posts, Plaintiff contacted Defendants via email and requested that the posts be removed. (Pl.'s Reply 5.) Though Defendants initially refused, they removed the posts and photos after being contacted by Plaintiff's attorney. (Id.) Plaintiff claims, however, that Richie "intentionally reposted the pictures and/or written matter pertaining to [Plaintiff] after the commencement of the

5

present suit." (Id.) Richie states that this allegation is "100% false," that he has not reposted the photos since they were removed, and that he does not intend to repost them "as long as their authenticity remains in dispute." (Richie Aff. ¶¶ 33-34.)

On May 4, 2011, Plaintiff filed the instant lawsuit asserting claims for: Count I: Defamation; Count II: Invasion of Privacy – False Light; Count III: Misappropriation of Name and Likeness; Count IV: Statutory Misappropriation of Name, Photograph, and Likeness; Count V: Intentional Infliction of Emotional Distress; Count VI: Invasion of Privacy – Intrusion upon Seclusion and Publicity Given to Private Life; Count VII: Civil Conspiracy; Count VIII: Veil Piercing and Vicarious Liability; and Count IX: Injunctive Relief. (See generally Compl.)

In the instant motion, Plaintiff seeks to enjoin Defendants from republishing the offensive posts and photographs on TheDirty.com.[2] At the hearing, defense counsel stated that Defendants had no intention of republishing the posts pertaining to Plaintiff. However, the parties were unable to come to an agreement in this regard. (See Richie Aff. ¶ 33.)

---

[2] In the material submitted to the Court prior to the hearing, Plaintiff's request for injunctive relief was much broader and was based on her defamation, invasion of privacy, and publicity rights claims. At the hearing, however, Plaintiff clarified that her request for injunctive relief was based solely on her publicity rights claim and limited to enjoining Defendants from republishing the two posts pertaining to Plaintiff.

6

**II. STANDARD OF REVIEW**

A preliminary injunction is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." Overstreet v. Lexington-Fayette Urban Cnty. Gov't, 305 F.3d 566, 573 (6th Cir. 2002). A district court's determination on whether to issue a preliminary injunction is within the discretion of the court. Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992).

When deciding whether to grant preliminary injunctive relief, a court must consider the following factors:

> (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.

Overstreet, 305 F.3d at 573. "[T]he four factors are not prerequisites to be met, but rather must be balanced as part of a decision to grant or deny injunctive relief." Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1381 (6th Cir. 1995) (citing In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985)).

The first factor—the likelihood of success—is the predominant concern. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the

7

merits is usually fatal." Gonzales v. National Bd. of Med. Exam'rs, 225 F.3d 620, 625 (6th Cir. 2000); see also Michigan State AFL-CIO v. Miller, 103 F.3d 1240, 1249 (6th Cir. 1997) ("While, as a general matter, none of these four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.").

**III. ANALYSIS**

Plaintiff moves for injunctive relief solely on the basis of her publicity rights claim.[3] Defendants oppose Plaintiff's motion, arguing that injunctive relief should be denied because Plaintiff cannot show a likelihood of success on the merits.[4] (Defs.' Resp. 11, 14-17.)

The Tennessee Legislature codified the right of publicity in 1984 when it enacted the Tennessee Personal Rights Protection

---

[3] The Court will assume, for purposes of this motion, that Plaintiff's publicity rights claim falls within the CDA's statutory exclusion for claims that arise from "any law pertaining to intellectual property." 47 U.S.C. § 230(e)(2).

[4] Defendants make the following additional arguments: (1) Plaintiff's request is moot to the extent that the posts have already been removed; (2) prospective injunctive relief is a prior restraint in violation of the First Amendment; (3) the Communications Decency Act (the "CDA"), 47 U.S.C. § 230, which provides interactive service providers immunity from liability for any cause of action that would treat the provider as a publisher of third-party content, expressly bars injunctive relief in this context; and (4) Plaintiff is unlikely to succeed on the merits of her publicity rights claim because, (i) while the CDA exempts federal intellectual property claims from the scope of its immunity, the exemption does not apply to intellectual property claims based on state law, and (ii) Defendants can avail themselves of the fair use defense. (See generally Defs.' Resp.) The Court need not reach the merits of these additional arguments, however, because the Court finds that Plaintiff has failed to demonstrate a likelihood of success on the merits of her publicity rights claim.

8

Act ("TPRPA").[5] Tenn. Code Ann. § 27-25-1101 et seq. In pertinent part, the TPRPA provides that:

> [a]ny person who knowingly uses or infringes upon the use of another individual's name, photograph, or likeness in any medium, in any manner directed to any person other than such individual, as an item of commerce for purposes of advertising products, merchandise, goods, or services, or for purposes of . . . purchases of products, merchandise, goods, or services, without such individual's prior consent, . . . shall be liable to a civil action.

Tenn. Code Ann. § 27-25-1105(a). The statute was intended to "create an inheritable property right for those people who use their names or likenesses in a commercial manner, such as an entertainer or sports figure——someone who uses his or her name for endorsement purposes." Apple Corps. Ltd. v. A.D.P.R., Inc., 843 F. Supp. 342, 348 (M.D. Tenn. 1993) (quoting Senator Kyle, sponsor of the TPRPA, from the April 5, 1984 audio recording of the Tennessee legislative session) (internal punctuation omitted).

---

[5] Tennessee's common law and statutory rights of publicity are coextensive and limited to commercial use for purposes of advertising or soliciting a product or service. Cf. State ex rel. Elvis Presley Intern. Memorial Foundation v. Crowell, 733 S.W.2d 89, 96 (Tenn. Ct. App. 1987) (noting that the "General Assembly undertook to [define the parameters of the right of publicity] when it enacted [the TPRPA]"); Elvis Presley Enters, Inc. v. Elvisly Yours, Inc., 936 F.2d 889 (6th Cir. 1991) (holding that the provision of the injunction issued by the district court on the plaintiff's common law and statutory rights of publicity, which prohibited the defendants from using the trademarks "for any purpose whatsoever," was "too broad insofar as it cover[ed] more than the unauthorized commercial use or exploitation of EPE's rights"); see also Cordell v. Detective Publications, Inc., 307 F. Supp. 1212, 1217 (E.D. Tenn. 1968), aff'd , 419 F.2d 989 (6th Cir. 1969) (rejecting the plaintiff's common law right of publicity claim and noting that "the charge that the defendant's publication was primarily to advance the defendant's commercial interests and was for commercial exploitation does NOT state a cause of action for appropriation.") (emphasis in original).

Plaintiff argues that, by selectively publishing posts about Plaintiff based on her status as a television news reporter, Defendants have exploited Plaintiff's image and likeness for commercial gain in violation of her right of publicity. (Pl.'s Reply 13-14.) Plaintiff claims that Defendants' unauthorized use falls within the proscription of the TPRPA because, by using a local news celebrity on the site, Defendants increased the volume of internet users to the site. (Id. at 14.) This increase in traffic, Plaintiff asserts, consequently increased Defendants' advertising revenue because some of the site visitors viewed and clicked on advertisements and purchased various goods and services. (Id.) Plaintiff thus argues that Defendants are appropriating identities as an item of commerce, and that this appropriation is the source of revenue supporting their website. (Id.)

Defendants assert that Plaintiff's publicity rights claim fails on its face because Defendants did not use Plaintiff's name or likeness for purposes of advertising or soliciting any goods or services. (Id. at 11.) The Court agrees.

The TPRPA "does not prohibit *all* unauthorized uses of another's name or likeness." Apple Corps., 843 F. Supp. at 347. (emphasis in original). Rather, the statute is "narrowly drawn," id., "proscribing only the unauthorized use of another's name or likeness in advertising." Id. at 347 n.2. The limited

10

scope of uses prohibited by the statute was explained in <u>Apple Corps</u>. In a Beatles look-alike performance case, the court granted the plaintiff's motion for partial summary judgment, finding that, while the defendants' advertisements for their performances did violate the TPRPA, the performances themselves did not. <u>Id.</u> at 347-49. Even though the defendants engaged in the performances as a commercial endeavor, the court reasoned that defendants' use of the Beatles' personas during the performances and the Beatles logo on the group's bass drum did not violate the TPRPA because the statute only forbids use of name or likeness for the purpose of "advertising" or "soliciting" purchases of goods or services. <u>Id.</u>

In this regard, Tennessee's right of publicity is narrower than the Restatement approach adopted by other states, which provides that appropriation applies "when the defendant makes use of the plaintiff's name or likeness for his own purposes and benefit, even though the use is not a commercial one, and even though the benefit sought to be obtained is not a pecuniary one." Restatement (Second) of Torts § 652C, cmt. b.

Relying on the Restatement, the district court in <u>Faegre & Benson, LLP v. Purdy</u>, 367 F. Supp. 2d 1238 (D. Minn. 2005), found that the plaintiff stated a claim against the defendant, a website operator, for misappropriation based on the operator's use of the plaintiff's name in the body of four website domain

11

names.  Id. at 1248.  The court held that the defendant "appropriated [the plaintiff's] name for his own purposes and benefit—to mislead internet users into visiting [the defendant's] website when they are actually seeking [the plaintiff's] website" and to "gain[] the benefit of luring the user to [the defendant's] site by exploiting [the plaintiff's] name."  Id. at 1248.  By contrast, Tennessee's right of publicity is narrower and applies only to an unauthorized use in advertisements or solicitations. Apple Corps, 843 F. Supp. at 347.

Other cases where courts have found that the unauthorized use of the plaintiff's name or image violated his or her right of publicity are likewise distinguishable from the instant case. For example, in Coton v. Televised Visual X-Ography, Inc., 740 F. Supp. 2d 1299 (M.D. Fla. 2010), the court held that the defendant's placement of the plaintiff's self-portrait "prominently on the packaging of the Body Magic DVD for the purpose of marketing a pornographic movie" without the plaintiff's permission was a violation of Florida's statutory right of publicity.[6]  Id. at 1310-11 (citing Fla. Stat. §

---

[6]  Florida's right of publicity statute provides: "No person shall publish, print, display or otherwise publicly use for trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by [such person]." The Coton court noted that Florida's statute "is construed as requiring that the unauthorized use of the person's image 'directly promote the product.'" Id. at 1310 (citing Tyne v. Time Warner Entm't Co., L.P., 901 So.2d 802, 808 (Fla. 2005)). The court

540.08).

Similarly, the court in Doe v. Friendfinder Network, Inc., 540 F. Supp. 2d 288, (D.N.H. 2008), relied on a leading treatise and found that Plaintiff had stated a claim for infringement of her right of publicity against the defendants, operators of online web communities where members could meet each other through online personal advertisements. Id. at 304 (citing J. Thomas McCarthy, The Rights of Publicity and Privacy, § 3:2 (2d ed. 2000)). In Doe, the plaintiff alleged that an unknown third-party created a profile that included identifiable aspects of her persona, that the profile was placed on a number of the defendants' web communities, and that the defendants then used portions of the profile in advertisements and "teasers" on other websites to draw users to the site and to increase the profitability of their business. Id. The court denied the defendants' motion to dismiss, finding that the allegations were sufficient to state a claim for infringement of the plaintiff's right of publicity. Id.

Finally, in Bosley v. Wildwett.com, 310 F. Supp. 2d 914 (N.D. Ohio 2004), the district court granted injunctive relief against the producers/sellers of a wet t-shirt contest videotape

---

explained, therefore, "that merely including the misappropriated image in a publication that is sold for profit is insufficient; rather, the harm emanates from 'the way that the use associates the person's [likeness] with something else.'" Id.

based upon the factual finding that defendant prominently displayed the plaintiff's name, image, and likeness on the cover of the defendants' video, and that such advertisements were not merely "incidental to the promotion" of these products.  Id. at 923.  The court emphasized that the defendants made the editorial choice to make the plaintiff the focus of their advertisements by prominently displaying the plaintiff on the videotape package, in advertisements, and on their website.  Id.  In addition, the defendants' marketing efforts were aimed at emphasizing the role of the plaintiff—the plaintiff was a local news anchorwoman and regional celebrity, which fact the video producers allegedly exploited by marketing the videotape with an emphasis on the appearance of the "naked anchor woman."  Id. at 917.

In each of the aforementioned cases, the plaintiffs demonstrated a causal connection between the defendants' use of their persona and a direct, non-incidental benefit to the defendants from that use.[7]  By contrast, Plaintiff has not demonstrated a causal connection in the instant matter between

---

[7]   To be sure, the TPRPA is narrower than the right of publicity claims analyzed in the aforementioned cases.  In Coton, Doe, and Bosley, a mere showing of a causal connection between the unauthorized use and a non-incidental, direct benefit to the defendants was sufficient to state a claim.  Under the TPRPA, however, the causal connection that Plaintiff must show is the unauthorized use of her name or image in an advertisement or solicitation.  Thus, even if Plaintiff were able to show that Defendants' use of her name and image resulted in an increase in visitors to the site or advertising revenue, it is not entirely clear that she would succeed on her publicity rights claim.

14

Defendants' use of her name and image and an increase in visitors to the site or advertising revenue. Plaintiff has offered no evidence that Defendants marketed their site by emphasizing Plaintiff's appearance on the site, used portions of the posts in teasers on other sites to draw more visitors, prominently displayed the posts regarding Plaintiff on the site, advertised Plaintiff's appearance in connection with the sale of any of Defendants' products, or charged higher premiums to advertisers for advertising space on the pages pertaining to Plaintiff.

At the hearing, Defendants acknowledged that the site makes money, but emphasized that it does not necessarily make money from the posts pertaining to Plaintiff, which constitute two posts out of over 75,000 on the site.  Defendants also pointed out that the offending posts are not used, and were never used, to advertise TheDirty.com.  Plaintiff offered no evidence to the contrary.

In her complaint and briefs, Plaintiff has suggested, at most, a currently unsubstantiated connection between the general use of celebrity personas on the site and an increase in traffic and/or advertising revenue.  Plaintiff states that "those posts pertaining to celebrities' personal lives are more valuable than those pertaining to an average person's because of their potential to draw a wider audience to [TheDirty.com]."  (Pl.'s

15

Reply 14.) Plaintiff also alleges Defendants' advertising revenue "is believed to be directly related to the volume of hits on stories, pictures and comments about a specific individual such as Plaintiff." (Id. at 14 n.2.) However, Plaintiff's speculative assertions regarding Defendants' advertising revenues are insufficient to meet Plaintiff's burden of demonstrating that she is entitled to injunctive relief.

The Court finds that Plaintiff has failed to demonstrate a likelihood of success on the merits of her right of publicity claim under the TPRPA. This finding is dispositive of Plaintiff's motion for a preliminary injunction. Gonzales, 225 F.3d at 625 ("[A] finding that there is simply no likelihood of success on the merits is usually fatal."). Accordingly, the Court finds that Plaintiff has failed to meet her burden of proving entitlement to preliminary injunctive relief.

### III. CONCLUSION

Finding that Plaintiff has failed to establish a likelihood of success on the merits, Plaintiff's Motion for Preliminary Injunction is **DENIED**.

**IT IS SO ORDERED,** this 29th day of July, 2011.

                                      s/ JON P. McCALLA
                                      JON P. McCALLA
                                      CHIEF U.S. DISTRICT JUDGE